Robert GENTILE, Plaintiff,

v.

FRANKLIN SPORTS, INC., Defendant.

No. CIV. 01–10332–NG.

United States District Court,
D. Massachusetts.

July 1, 2002.

Donald T. MacPhail, III, Law Office of Donald T. MacPhail, Berkley, MA, Thomas P. O'Connell, O'Connell law Office, Burlington, MA, for Robert Gentile.

Michael R. Coppock, Rubin and Rudman, Boston, MA, Joseph B. Bowman, Shook, Hardy & Bacon, LLP, Kansas City, MO, for Franklin Sports, Inc.

### MEMORANDUM AND ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

GERTNER, District Judge.

Before me is Magistrate Judge Dein's Report and Recommendation on Cross–Motions For Summary Judgment, dated February 15, 2002 ("Report"). I hereby adopt the findings and conclusions of Judge Dein detailed in her Report. Defendant Franklin Sports, Inc.'s ("Franklin") motion for summary judgment [docket entry # 30] is **DENIED** in its entirety. Plaintiff Robert Gentile's ("Gentile") cross-motion for summary judgment [docket entry # 33] is **GRANTED** with regard to Count I, patent infringement, and **DENIED** with regard to Count V, false marking. I write further simply to address an argument advanced by Franklin based on the Supreme Court's recent decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* — U.S. ——, 122 S.Ct. 1831, 152 L.Ed.2d 944 (May 28, 2002), which was handed down after Judge Dein issued her Report. The issue raised by the parties is—which party bears the burden of proving that a patent claim has been narrowed by representations made in the prosecution history?

■ In her Report, Judge Dein correctly noted that when faced with a patent infringement claim, a court must first construe the meaning of the claim as a matter of law, in order to "define the scope of the patentee's rights under the patent." *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970–71 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). As a part of this claim construction analysis, Franklin argued, based on *Festo,* that the burden is on the patentee to show that statements made by him during the prosecution of his patent do not limit a more expansive construction of his claim that would otherwise spring from the plain, ordinary meaning of the language of the claim.

■ In *Festo,* the Supreme Court addressed the relation between two patent law concepts—the doctrine of equivalents and the rule of prosecution history estoppel. It held that where the patentee is seeking to broaden the scope of the literal terms of his patent through the doctrine of equivalents, he bears the burden of showing that amendments made to his claim during the prosecution history did not relinquish the particular equivalent he argues has been infringed, at least where he made the amendment for a substantial reason relating to patentability. *Festo,* 122 S.Ct. at 1841–42.

While it is true that under the doctrine of prosecution history estoppel, the burden is on the patentee to prove that he did not surrender the particular equivalent in question with an amendment to his claim, the analysis is different when a court is construing the language of a claim in the first instance. The Federal Circuit has made "a clear distinction between following the statements in the prosecution history in defining a claim term, and the doctrine of prosecution history estoppel." *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed.Cir.1995). It has defined the relevant difference as follows:

> Claim interpretation in view of the prosecution is a preliminary step in determining literal infringement, while prosecution history estoppel applies as a limitation on the range of equivalents if, after the claims have been properly interpreted, no literal infringement has been found. The limit on the range of equivalents that may be accorded a claim due to prosecution history estoppel is *simply irrelevant* to the interpretation of those claims.

*Id.* (emphasis added) (internal citation omitted).

 In her Report, Judge Dein correctly noted that when a court construes claim language, there is a " 'heavy presumption' in favor of the ordinary meaning of the claim language as understood by one of ordinary skill in the art." *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed.Cir.2001). However, this presumption may be overcome if the intrinsic evidence, including the prosecution history, "clearly redefine[s] a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." *Id.* In other words, when engaging in claim construc-

tion, a court begins with the ordinary meaning of the claim language as understood by one of ordinary skill in the art. If there is then clear evidence in the prosecution history that the patentee redefined the claim term to a narrower construction in order to overcome an objection by the examiner, a court construing the claim must accept this narrower construction. Thus, in claim construction, there is a presumption that favors an interpretation adopting the ordinary meaning of the claim language, which may be overcome by evidence that the patentee effectively narrowed his claim during the patent application process.

 The different settings—claim construction, on the one hand, and the doctrine of equivalents, on the other—determine the nature of the burdens. Under *Festo*, the patentee seeking to expand the scope of his claim beyond literal infringement through the doctrine of equivalents bears the burden of demonstrating that an amendment to his claim during the prosecution history should not estop him from claiming a particular equivalent. However, a defendant seeking to narrow the claim by arguing that the patentee has relinquished a potential claim construction based on the plain, ordinary meaning of the language of the claim bears the burden of overcoming a heavy presumption in the patentee's favor. He must prove that the patentee made clear representations during the prosecution history which limit the scope of his claim.

This allocation of the burden of proof makes sense because it places the burden on the party seeking to change the scope of patent protection from what the ordinary, plain meaning of the claim language would otherwise grant. In the claim construction context, where a party seeks to *limit* the reach of the otherwise plain meaning of the claim language, the burden

is on him to prove that the prosecution history limits the claim language. Similarly, in the doctrine of equivalents context, where a patentee seeks to *broaden* the scope of the patent's protection beyond that which would be otherwise granted by the plain meaning of the claim language, the burden is on him to prove that an amendment made during the patent's prosecution should not limit the scope of the patent's protection.

In the case at bar, Franklin has failed to demonstrate that during the prosecution of the patent, Gentile limited the plain, ordinary meaning of the phrase "non-toxic liquid antifreeze" by excluding any solution of salt dissolved in water or by confining this phrase to propylene-based antifreeze used in recreational vehicles. As detailed by Judge Dein in her Report, the statements and amendments made by the patentee in his patent prosecution do not show that he relinquished an interpretation of his claim that included non-toxic saltwater solutions or antifreeze solutions beyond those used in recreational vehicles.

For the foregoing reasons, I adopt the findings and conclusions contained in Judge Dein's Report. Franklin's motion for summary judgment [docket entry # 30] is **DENIED** in its entirety. Gentile's cross-motion for summary judgment [docket entry # 33] is **GRANTED** with regard to Count I, patent infringement, and **DENIED** with regard to Count V, false marking.

SO ORDERED.

### REPORT AND RECOMMENDATION ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

### I. *INTRODUCTION*

Plaintiff Robert Gentile ("Gentile"), owner of U.S. Patent No. 5,722,906 ("the '906 Patent") has brought suit against Franklin Sports, Inc. ("Franklin Sports" or "Franklin") alleging that the defendant is manufacturing and selling an all-weather street hockey ball based on an idea developed and eventually patented by the plaintiff. The complaint sounds in six counts: patent infringement (Count I), misappropriation and conversion of proprietary information (Count II), tortious interference with business relations (Count III), violation of Mass. Gen. Laws ch. 93A (Count IV), false marking in violation of 35 U.S.C. § 292(a) (Count V), and conversion (Count VI). Franklin Sports has denied liability and has counterclaimed challenging the validity of the '906 Patent.

Presently before the court are the parties' cross-motions for summary judgment on the claims of patent infringement and false marking. For the reasons detailed herein, this court recommends that Gentile's motion for summary judgment on the claim of patent infringement (Docket # 33) be ALLOWED and that Franklin's motion for summary judgment on the patent infringement claim (Docket # 30) be DENIED. This court further recommends that both motions for summary judgment on the false marking claim be DENIED, as material facts are in dispute. Since the two claims are based on different facts and raise different issues of law, they will be addressed separately herein.

### II. *OVERVIEW OF PATENT INFRINGEMENT ANALYSIS*

The approval of a U.S. Patent results in one or more claims which contain the essential description of the method or device to which the inventor has exclusive rights. *See* 35 U.S.C. § 112 (defining claims as "particularly pointing out and distinctly claiming the subject matter which the ap-

plicant regards as his invention"). There are two steps in a patent infringement analysis. First, the court must construe the meaning of the claim as a matter of law, to "define the scope of the patentee's rights under the patent." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Secondly, the accused method or device is compared to the properly-construed claim. "A claim is literally infringed when the accused device literally embodies each limitation of the claim." *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1370 (Fed.Cir.2000).

"Summary judgment is appropriate when it is apparent that only one conclusion as to infringement could be reached by a reasonable jury.... Summary judgment of noninfringement is appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, since such failure will render all other facts immaterial." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.2001) (internal citations omitted). A moving party "bears the initial burden of coming forward with sufficient evidence to demonstrate that there is no material issue of fact that would preclude summary judgment, and that it is entitled to judgment as a matter of law." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 806 (Fed.Cir.1999). "Claim interpretation, as a question of pure law, is amenable to summary judgment and disagreement over the meaning of a term within a claim does not necessarily create a genuine issue of material fact." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir.), *cert. denied*, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995), and cases cited. "Where, as here, the parties do not dispute any relevant facts regarding the accused product but disagree over which of two possible meanings of Claim 1 is the proper one, the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed. Cir.1996). *Accord Johnson Worldwide Assoc. v. Zebco Corp.*, 175 F.3d 985, 988–89 (Fed.Cir.1999).

### III. FACTS REGARDING THE PATENT INFRINGEMENT CLAIM

The '906 "Game Ball" Patent was issued to Gentile on March 3, 1998. Plaintiff's Summary Judgment Notebook ("SJ Ex.") at Ex. 1. What is claimed therein is:

A game ball is the shape of a sphere for use in playing street hockey, the game ball consisting of a hard, rigid, spherical shell enclosing a cavity, and a *non-toxic liquid antifreeze* contained in said cavity, the spherical shell having a smooth unobstructed spherical inner surface, and the *non-toxic liquid antifreeze* occupying less than one-half of the volume of said cavity whereby the center of gravity of said game ball is below the geometric center of said game ball and the *non-toxic liquid antifreeze* moves freely over the spherical inner surface of said game ball during movement of the game ball over a playing surface.

(Emphasis added). The defendant Franklin manufactures a street hockey ball which contains "the salt calcium chloride dissolved in water." *Declaration of Charles Quinn* ("Quinn Decl.") at ¶ 2. At oral argument, defendant admitted that this is a "non-toxic liquid antifreeze." Nevertheless, Franklin has moved for summary judgment of non-infringement on the grounds that Gentile's patent "excludes coverage of salt water solutions" and is limited to "recreational vehicle antifreeze

in a ball." [1] *See* Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 8. Since these limitations are not found in the claim itself, resolution of the issue raised by Franklin requires an analysis of the specifications contained in the patent and the prosecution history.

■ When analyzing infringement claims, there is a " 'heavy presumption' in favor of the ordinary meaning of claim language as understood by one of ordinary skill in the art." *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc.*, 262 F.3d 1258, 1268 (Fed.Cir.2001) (internal quotation marks omitted). This presumption may be overcome if the claim term is not sufficiently clear to define the scope of the invention, or if a patentee defines a term away from its ordinary meaning to impart a novel meaning. *Id.* This court is charged with examining the claim language as well as intrinsic evidence—the specification and prosecution history—to determine if such evidence " 'clearly redefine[s]' a claim term so as to put one reasonably skilled in the art on notice that the patentee intended to so redefine the claim term." *Id.* and cases cited. *See also Markman v. Westview Instruments*, 52 F.3d at 979 (court utilizes claims, specification and prosecution history as sources for claim interpretation). Finally, in the "rare circumstance" that the intrinsic evidence is insufficient for claim construction, the court may look to extrinsic evidence such as "expert testimony, articles, and inventor testimony." [2] *Bell Atlantic v. Covad*, 262 F.3d at 1269.

■ A patentee's redefinition away from the ordinary meaning of claim terms may occur expressly, when a patentee has "chosen to be his or her own lexicographer." *Id.* at 1268. A redefinition may also occur by implication, when a patent's specification clearly and exclusively contemplates particular embodiments of the invention or disclaims other possible embodiments. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341–42 (Fed.Cir.2001). Further, a patentee's representations in amendments and writings to the PTO within the prosecution history may circumscribe the "scope and meaning of the claims." *Bell Atlantic v. Covad*, 262 F.3d at 1268.

## A. *Language of the Claim*

As detailed above, Claim 1 claims "a non-toxic liquid antifreeze" contained in the cavity of the ball which "moves freely" over the interior surface of the ball. (SJ Ex. 1, '906 Patent, col. 4, ll. 1–2, 7). No description of the chemical composition of the non-toxic liquid antifreeze is given. Franklin conceded in oral argument that the plain and ordinary meaning of such

1. As detailed *infra*, however, Franklin does not contend that its calcium chloride solution cannot be used as an antifreeze in a recreational vehicle.

2. The defendant filed an opposition to the affidavits of Catherine Johnson, a chemist, and of Robert Gentile (Docket # 40). Because in this case the intrinsic evidence was sufficient for the court properly to construe the claim, the affidavits were excluded from consideration. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996) ("In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper."); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d at 1578 (expert affidavits cannot be used to alter meaning as determined by intrinsic evidence). Gentile's affidavit was not considered for the additional reason that "[t]he subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim (except as documented in the prosecution history)." *Markman v. Westview Inst., Inc.*, 52 F.3d at 985.

language to one skilled in the art does not exclude the calcium chloride solution used in its ball. Since the language of the claim itself does not support Franklin's defense, we therefore turn to the specification and the prosecution history.

### B. *Language of the Specification*

The specification describes the liquid in the following manner: "the preferred liquid is a nontoxic antifreeze. Such antifreeze is available for use in RVs (recreational vehicles)." (SJ Ex. 1, '906 Patent, col. 2, ll. 13–15). The specification provides a description of the general benefits of non-toxic antifreeze, to wit: "non-toxic antifreeze ... lowers the ball[']s center of gravity, increases control, and reduces bounce. The antifreeze is particularly useful for this application since its viscosity is relatively low and varies little with temperature so that, whether the ball is used in winter or summer, the ball's improved performance is substantially unaffected." (*Id.* at ll. 59–65). No further description of the antifreeze is provided, nor are any further details given concerning the types of antifreeze which might be used by RVs.

### C. *Language of the Prosecution History*

■ "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Tech., Inc. v. Cardinal IG Co.*, 54 F.3d at 1576 (citing *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed.Cir.1991)). A patentee may "relinquish[ ] a potential claim construction in an amendment to the claim or in an argument to overcome or distinguish a reference." [3] *Id.* Franklin contends that Gentile relinquished a broad construction of "non-toxic liquid antifreeze" by his representations to

the PTO during the prosecution of the patent. However, after examination, this court finds that the prosecution history does not reveal the relinquishment of claims to the extent urged by the defendant. The pertinent history is given in some detail below, as the exchange between the patent examiner and Gentile forms the basis for the present dispute between the parties.

On March 21, 1994, Gentile filed Patent Application No. 08/215,892 for a "Hockey ball containing fluid." (Patent and Trademark Office File History submitted by the defendant ("PTO History") at Ex. 1). The invention was of a ball with a "hard, sturdy, bounce resistant shell which contains a freely moving weight," preferably a liquid. (*Id.* at p. 3 (Summary)). The description states that the "preferred liquid is a nontoxic antifreeze. Such antifreeze is available for use in RVs (recreational vehicles)." (*Id.* at p. 4). The application included over 20 claims. The most detailed description in the claims of the liquid was "a nontoxic antifreeze." (*Id.* at pp. 7–8). On September 2, 1994, all the claims were rejected. (PTO History at Ex. 2). Among the reasons given was that claims were anticipated by the "Brewster" patent and "Goldfarb" patent. (*Id.* at pp. 2–3). The Brewster patent was for a ball containing a viscous, friction, fluid, i.e. oil, and the Goldfarb patent was for a ball containing a ball which caused erratic movement. (PTO History at Ex. 4, pp. 3–4).

Gentile filed an "Amendment and Response" on January 6, 1995, adding a new Claim 5 for a ball with a "freely moving liquid" inside. (*Id.*, Ex. 4 at p. 2). Gentile distinguished the viscosity of oil, syrup and

---

**3.** The prosecution history must be in evidence to be considered by court in construing claims in a motion for summary judgment. *See Interactive Gift Express, Inc. v. Compu-* *serve Inc.*, 256 F.3d 1323, 1331 (Fed.Cir. 2001). The defendant submitted the entire prosecution history to the court following oral argument on this motion.

a nontoxic antifreeze, specifically "UNI-GARD–50 Freeze Proof, Propylene Glycol Based." (*Id.* at p. 4). It was Gentile's position that the viscous fluid would not work for a hockey puck as it becomes very thick, especially when cold. On the other hand, "[n]ontoxic antifreeze is very non-viscous, and its viscosity varies little with temperature. Since street hockey is played in hot summer weather and cold late fall weather, sometimes below freezing, a ball consistently simulating a hockey puck is necessary." (*Id.* at p. 3, ¶ 4).

On March 10, 1995, all pending claims, as amended, were again rejected, partially for being anticipated by "McNeill," a sports ball with a void "which contains loose internal material which can be water." (PTO History at Ex. 5, pp. 1–3). The examiner also noted that while Gentile had made comparisons between oil, syrup and antifreeze, "none of these materials is being claimed." (*Id.* at p. 3.)

On or about July 10, 1995, Gentile submitted an Amendment and Response specifically adding Claim 25 for the liquid to comprise "a nontoxic antifreeze." (PTO History at Ex. 6, claim 25 and p. 4). No further description of the liquid is included. On August 22, 1995, the examiner rejected the claims, citing the Townsend patent as anticipating Gentile's application by disclosing a ball that could be partially filled with liquid. (PTO History at Ex. 7, p. 3). The examiner noted, however, that Claim 25 would be allowable if rewritten in an independent form. (*Id.*).

Shortly thereafter, in or about September 1995, Gentile filed a petition under 37 C.F.R. § 1.102(d) to have his application advanced out of turn due to the entry into the market of Sun Hockey's Zero Ball which he believed infringed on his claims.

(PTO History at Ex. 8). The petition was granted on December 14, 1995. (PTO History at Exs. 9, 10). Gentile then filed a "Preliminary Amendment to Continuation Application" which amended Claim 25 to be for a ball for hockey which contained "freely moving non-toxic antifreeze." (PTO History at Ex. 13 at p. 3).[4] The accompanying specification explained that "the preferred embodiment of the invention employs non-toxic antifreeze as the liquid which lowers the ball[']s center of gravity, increases control, and reduces bounce. The antifreeze is particularly useful for this application since its viscosity is relatively low and varies little with temperature so that, whether the ball is used in winter or summer, the ball's improved performance is substantially unaffected." (*Id.* at p. 2). In accompanying remarks, Gentile stated that the "invention transcends the type of liquid contained" in the ball, and requested a broad reading of his application's claims since "knock-offs" selling a "less preferred embodiment using a different liquid" (i.e., a liquid other than nontoxic antifreeze) were enjoying the benefits of his invention even though not exactly duplicating his invention's preferred embodiment. (*Id.* at p. 6.)

On May 23, 1996, the claims were again rejected. (PTO History at Ex. 15, p. 4). In rejecting the claims, the examiner introduced the concept of "salt" which has been pivotal in the instant case, but which had never been mentioned before. (*Id.* at p. 2). As the examiner wrote in relevant part:

> It is not clear what features are critical in this case. Base claim 25 is too broad, obviously, and indefinite, due to the relative terms "freely moving" and "non-

---

4. The application was now being reviewed by a different patent agent. (PTO History at Ex. 13, p. 4).

toxic" and "antifreeze" found within any relatively small, relatively hard spherical object. *For example, a small quantity of "salt" is an "antifreeze" material inherently* and doubtless can be found in a spherical shaker container, which structure would correspond to claim 25. Numerous other examples can be found by the examiner, if necessary.

(*Id.* at pp. 2–3) (emphasis added). In addition, in rejecting the claims as being anticipated by, or as obvious over Brewster, the examiner wrote:

> In regard to applicant's remarks and comparative data regarding oil, syrup, and antifreeze, filed January 6, 1995, such are *directed to a propylene glycol based antifreeze solution, rather than to the antifreeze materials defined so broadly by the claims.* Since claims 24–29 define no certain materials for the ball's hard outer shell, Brewster's ball shell is inherently as much a ball for use in street hockey as is the applicant's game ball.

(*Id.* at p. 4) (emphasis added). Thus, at least as of May 23, 1996, it was clear that Gentile was not limiting his claim either to an antifreeze used in RVs or, even more limiting, to a propylene glycol antifreeze.[5]

Gentile submitted another amendment to Claim 25 on or about July 16, 1996, describing the liquid as a "freely moving, non-toxic liquid antifreeze solution." (PTO History at Ex. 16, p. 12). In addition, he proposed a new dependent Claim 29 that specified the antifreeze as a "non-toxic propylene glycol based antifreeze solution." (*Id.*) The claims were rejected on September 18, 1996. (PTO History at Ex.

17). With respect to Claim 25, the examiner objected because "it is not clear whether it is the liquid antifreeze 'solution' that occupies less than half the void, or whether it is the antifreeze component of a liquid solution that occupies less than half of the void." (*Id.* at p. 3). With respect to the other claims, the examiner contended that the liquid claimed could be simply water "to which another component such as TEPOL is added." (*Id.* at p. 4).

In a response dated November 5, 1996, Gentile amended Claim 25 again, to return to the more general description of a shell "containing freely moving, non-toxic, liquid antifreeze, and the non-toxic, liquid antifreeze occupying less than half of the void." (PTO History at Ex. 18, revised claim 25 at claims p. 5). He also removed the reference to the "propylene glycol based antifreeze solution" in Claim 29. (*Id.*) In his remarks, Gentile again stressed the advantage of a "liquid antifreeze" as settling quickly so that the ball maintains a low center of gravity for more control, and exhibits substantially the same characteristics, regardless of the temperature. (*Id.* at Ex. 18, p. 3). All claims were again rejected on March 7, 1997, with the examiner again concluding that water alone or water with TEPOL could be the antifreeze. (PTO History at Ex. 19, p. 3). As the examiner wrote, "[i]t is well known that citrus growers in Florida commonly spray water on their citrus trees to prevent the fruit from freezing during cold spells, hence, said water, itself is a 'non-toxic' (claim 29) 'antifreeze' inherently since it can be used for that purpose." (*Id.*)

---

5. The examiner stated briefly that the claims were also anticipated by the later-filed "Aiello" patent, and assumed that the original application date of March 21, 1994 could not be used "due to new matter being claimed" in the continued application. (PTO History at Ex. 15, p. 4.) Gentile disputed the examiner's contention that the continuing claim could not relate back to the original filing date, as the amended claims were contained in the original conception of the invention. (PTO History at Ex. 16, p. 14.)

Gentile then requested, and received, a personal interview with the examiner. Gentile's counsel, Thomas O'Connell, also attended the meeting on May 14, 1997. (PTO History at Ex. 20). The examiner's notes of the meeting indicated that an agreement was not reached, and that the Townsend patent had been discussed as prior art. The examiner further noted:

Only one base claim 26 will be presented [and] will include "consisting" [and] "non-toxic" limitations. Remarks will include label of non-toxic antifreeze used in RVs.

(*Id.*)

On May 23, 1997, Gentile filed an Amendment After Final Rejection, which included an interview summary as required by the Manual of Patent Examining Procedure § 713.04. (PTO History at Ex. 21). The revised claim 26 now read:

A ball for use in street hockey, the street hockey ball *consisting of* a hard, hollow sphere of material and a freely moving, *non-toxic liquid antifreeze* contained within an inner volume of the sphere ..., and the *non-toxic liquid antifreeze* occupying less than one-half of the volume of the sphere whereby the street hockey ball's center of gravity is lowered below the geometric center of the ball.

(*Id.* at p. 1) (emphasis in the original).

In describing the substance of the interview, Gentile's counsel wrote:

The inventor gave a brief summary of his invention for a street hockey ball including the need left by prior art balls and his attempted solutions thereto. The inventor noted that mercury functioned exceedingly well as a liquid contained in the street hockey ball but that mercury was unusable due to its toxicity. *The inventor stated that he found non-toxic antifreeze of the type used in recreational vehicles (RVs) to be ideal.*

The inventor remarked that he discovered that non-toxic antifreeze worked equally as well as mercury while avoiding safety concerns regarding poisoning. It prevented freezing, did not "cling" to the inner surface of street hockey balls, and settled quickly even after being struck with a hockey stick.

The participants then discussed the meaning of "non-toxic" and "antifreeze." *The applicant and his attorney emphasized that the originally-filed specification indicated that "non-toxic liquid antifreeze" meant the type used in recreational vehicles. The Examiner was presented with a label from a bottle of such an antifreeze. A copy of the label is included herewith as Appendix A. The inventor's attorney noted that the specification's term comported with that found in Random House Webster's School and Office Dictionary which unequivocally defines "antifreeze" as "a liquid used in the radiator of an internal-combustion engine to lower the freezing point of the cooling medium."*

The participants discussed the Townsend patent including whether it disclosed a viscous liquid alone within a ball and whether it disclosed a salt water solution in a ball. *The examiner cited a concern regarding whether the term "non-toxic antifreeze" could include salt water, and the inventor pointed out that salt water is toxic and would not be within the scope of his claims. The inventor noted that too much salt water can poison and kill a person.*

(*Id.,* Ex. 21 at p. 2) (emphasis added). The attached "Appendix A" contained a label for "Easy Going," "a non-toxic" "RV & Marine Antifreeze" which was "odorless," "tasteless" and "contains propylene glycol." (*Id.*)

In the "Remarks" section of the submission, Gentile (through counsel) stated that by changing the preamble to "consisting of" from "comprising," the claim was now for "a spherical shell that contains *only* 'non-toxic liquid antifreeze.'" (*Id.* at Ex. 21, p. 4). As he wrote in addition:

Further still, the claim is clearly limited by the term "antifreeze" which further defines the single base claim over the prior art. On this note, Applicant respectfully submits that the Office's assertion in its Detailed Action that "liquid antifreeze" includes such liquids as water is contrary to both the commonly accepted definition of antifreeze and to Applicant's intended meaning for the claim limitation. *Random House Webster's School and Office Dictionary* unequivocally defines "antifreeze" as "*a liquid used in the radiator of an internal-combustion engine to lower the freezing point of the cooling medium.*" As the originally filed specification makes clear, this is essentially the definition Applicant intended to be attached to his use of the term "antifreeze." On page 5, lines 4 and 5, the originally-filed specification makes the term's meaning still more clear by stating that the "liquid antifreeze" used and claimed is of the type "available for use in RVs (recreational vehicles)." To make the Applicant's intended meaning of "liquid antifreeze" clearer still, Applicant submits herewith a label from a bottle of the antifreeze "available for use in RVs" as Appendix A of this paper.

With the foregoing in mind, Applicant submits that the definition of "liquid antifreeze" as used in Applicant's application is clear, and water can not be said to comport with such a definition because it would not lower the medium's freezing point. Indeed, water is normally the medium whose freezing point is sought to be lowered. The Office's assertion that water is used as an antifreeze by Florida citrus growers is not accurate. As the memo that is included as Appendix B herewith from Tropicana Products, Inc. indicates, citrus growers often use water as a jacket of insulation, not as antifreeze. The water does not function as an antifreeze for the citrus products any more than does fiberglass act as antifreeze for a home.

*Even beyond the previously-described claim limitations, which Applicant submits adequately distinguish over the prior art, the sole base claim further specifies that the "liquid antifreeze" is "non-toxic." As we discussed during Applicant's interview with the Office and even ignoring all other claim limitations, "non-toxic" would exclude a multitude of liquids including salt dissolved in water. As the inventor of the street hockey ball noted during the interview and as he writes in his declaration on Appendix C, salt water properly may be considered toxic. One need only look to stories of sailors lost in a sea of salt water who have died for lack of potable drinking water.*

. . . . .

[T]hrough experimentation during his development of the invention, the inventor discovered that for a multiplicity of reasons antifreeze was uniquely useful as the liquid to be included within the street hockey ball. Among the advantages of antifreeze are its low viscosity and low affinity for the inner surface of the ball. Together, these characteristics permit the liquid antifreeze to settle to the bottom of the ball quickly after the ball's being struck such that the ball maintains a low center of gravity even during the spirited play of street hockey. A further advantage of the liquid antifreeze is the consistency

of its performance over a wide range of temperatures. Unlike other, less-preferred liquids, such as water, balls containing antifreeze exhibit substantially identical handling characteristics whether used in the heat of summer or the dead of winter. With the unique advantages of non-toxic liquid antifreeze in mind, it becomes clear that presently-pending claims 24 and 26 are patently distinct over the prior art references.

(*Id.* at pp. 4–5) (emphasis added).

On June 5, 1997, the examiner himself amended, and allowed as amended, a new claim (now numbered 1). As allowed by the examiner, the claim is for:

> A game ball in the shape of a sphere for use in playing street hockey, the game ball consisting of a hard, rigid spherical shell enclosing a cavity, and a *non-toxic liquid antifreeze* contained in said cavity, the spherical shell having a smooth unobstructed spherical inner surface, and the *non-toxic liquid antifreeze* occupying less than one-half of the volume of said cavity whereby the center of gravity of said game ball is below the geometric center of said game ball and the *non-toxic liquid antifreeze* moves freely over the spherical inner surface of said game ball during movement of the game ball over a playing surface.

(PTO History at Ex. 23, p. 2) (emphasis added).

## IV. ANALYSIS OF PATENT INFRINGEMENT CLAIM

### A. The Alleged "Salt Water" Exclusion

■ "[A]lthough claims are construed objectively and without reference to the accused device, only those terms need be construed that are in controversy, and only to the extent necessary to resolve the con-

troversy." *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d at 803. As detailed above, Franklin contends that the '906 Patent excludes coverage of salt water solutions and that Franklin's ball, which contains "the salt calcium chloride dissolved in water," cannot, therefore, infringe. It is well established that claims are to be interpreted to exclude an interpretation which had been " 'disclaimed or disavowed during prosecution in order to obtain claim allowance.' " *KX Indus., LP v. Pur Water Purification Prods.,* No. 00–1543, 18 Fed.Appx. 871, 875, 2001 U.S.App. LEXIS 18155, at *8 (Fed.Cir. Aug. 21, 2001) (internal citation omitted). Thus, if a patentee disclaims a particular interpretation of a claim term, the term's ordinary meaning is modified according to such disclaimers. *See Hockerson–Halberstadt v. Avia Group Int'l,* 222 F.3d 951, 956 (Fed. Cir.2000). "But any limitation of the meaning attributed to the claim language based on such disclaimer must be shown in the intrinsic record with reasonable clarity and deliberateness." *KX Indus., LP v. Pur Water Purification Prods.,* 18 Fed. Appx. at 876, 2001 U.S.App. LEXIS 18155, at *10.

Here, neither the claim nor the specifications make any reference to salt water. The references in the prosecution history to salt water are not broad enough to exclude the non-toxic salt calcium chloride contained in Franklin's ball. "The relevant inquiry is whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1457 (Fed.Cir.1998), and cases cited. Here, it would not be reasonable to interpret the history as excluding the multitude of potential salt compounds which exist.

"Salt" appears in the patent's prosecution two times: when the examiner inquired whether salt in a round salt shaker

would be claimed by Gentile's patent; and when the inventor disclaimed "salt water" as a "toxic" liquid because "too much salt water can poison and kill a person," giving as an example sailors dying despite being surrounded by a "sea of salt water." As an initial matter, the plain meaning of the first statement refers to table salt, and the second to seawater. There is not any attempt to address the large number of salt compounds which exist. More importantly, any alleged disclaimer by Gentile is to a *toxic* liquid—it is impossible to separate the reference to salt water from its toxic effect. However, Franklin admits that its ball contains a non-toxic salt solution.[6] No competitor reading the '906 Patent history could reasonably conclude that a non-toxic salt solution is excluded. Since the alleged exclusion of all saltwater solutions is not shown "with reasonable clarity and deliberateness," Franklin's argument must fail.

Franklin argues that Gentile excluded "salt water" to distinguish it from the Townsend patent. However, the Townsend patent does not specifically claim a salt water solution. *See* SJ Ex. 3. Moreover, according to his counsel's summary of their interview, Gentile and the examiner discussed "whether [Townsend] disclosed a viscous liquid alone within a ball and whether it disclosed a salt water solution in a ball"—no resolution was apparently reached. (PTO History at Ex. 21, p. 2). In any event, Gentile stressed that *toxic* salt water solutions would be excluded from his patent. (*Id.*) The fact that this assertion was made in the context of dis-

tinguishing the Townsend patent adds nothing. Finally, and perhaps most importantly, in order to distinguish the Townsend patent, the claim was amended to consistently refer to "non-toxic liquid antifreeze." (*Id.* at p. 3). It was not amended to otherwise exclude salt water solutions. It is not appropriate to read a limitation into the claim which is not apparent from its ordinary meaning. *See Johnson Worldwide Assoc., Inc. v. Zebco Corp.,* 175 F.3d at 989 ("a court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of the claim terms").

## B. The Alleged Limitation to RV Anti–Freeze

Franklin also argues in passing that "Gentile's patent covers only recreational vehicle antifreeze," and that it is therefore entitled to a judgment of non-infringement as a matter of law. *See* Def.'s Mem. at 8.[7] This argument, however, is not clearly articulated and required extensive analysis by the court. For example, Franklin implies, but does not expressly assert, that the limitation to RV antifreeze is also properly limited to propylene glycol solutions. However, while I find that the claim is properly interpreted to incorporate the dictionary definition of antifreeze specifically identified by the inventor, it is not limited to antifreeze containing propylene glycol.

■■■ The claim itself makes no reference to any limitation on the type of non-

---

**6.** While recognizing that Gentile argued that "salt water" was excluded from his patent due to its toxicity, Franklin simply ignores the fact that its ball contains a non-toxic salt solution. Franklin seems to be implying that Gentile should be bound by an erroneous conclusion that all "salt water" solutions are toxic and are therefore excluded from the patent. This argument is not only illogical, it

goes much too far. Gentile did not purport to exclude all salts, nor did he contend that all salts are toxic. Franklin's contention that all "saltwaters" are excluded from the patent is without merit.

**7.** Franklin's principal argument is that salt water solutions are excluded from Gentile's patent, a claim I have rejected.

toxic liquid antifreeze which might be used. The specification states only that the "preferred liquid" is a "non-toxic antifreeze" and that such antifreeze is "available for use in RVs." However, the "general rule, of course, is that the claims of a patent are not limited to the preferred embodiment, unless by their own language." *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 973 (Fed. Cir.1999), and cases cited. The "court consistently declines to construe claim terms according to the preferred embodiment." *N. Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1293 (Fed.Cir.2000), and cases cited. Therefore, "preferred embodiments, without more, do not limit claim terms." *Id.* and cases cited. In the present case, the passing reference to RVs as part of a preferred embodiment in the specification does not limit the claim to non-toxic liquid antifreeze used in recreational vehicles.

The patent history does establish some limitations on the definition of "antifreeze," but it is not nearly as limited as Franklin suggests. Thus, the antifreeze is not limited to propylene glycol, nor is it limited to antifreeze used in RVs. Gentile did, however, adopt a specific dictionary definition of antifreeze which does control his claim.

■ In 1995, when Gentile provided information about the viscosity of oil, syrup and a propylene glycol-based antifreeze, the examiner expressly noted that "none of these materials is being claimed." (PTO History at Ex. 5, p. 3). This was again confirmed by the examiner in a rejection dated May 23, 1996. (PTO History at Ex. 15, p. 4). When in an effort to satisfy the examiner Gentile proposed in July 1996 that the antifreeze claimed be limited to a "non-toxic propylene glycol based antifreeze solution," the examiner still rejected the claim and the proposed limitation was then removed from all subsequent versions of the claims. (*See* PTO History at Ex. 16, p. 12; Ex. 17, pp. 3–4; Ex. 18, claims p. 5). Where, as here, a limitation is expressly removed from a claim during the application process, a reader of the record could only conclude that the proposed amendment did not constrain the meaning of the claim terms. *See Bailey v. Dart Container Corp.*, 980 F.Supp. 560, 579 (D.Mass.1996) (excluding limitation from claim construction where patentee added and then, prior to patent approval, removed limitation from claim).

The balance of the interactions between Gentile and the examiner similarly compels the conclusion that antifreeze is not limited to propylene glycol or to an antifreeze for RVs. Although Gentile provided a label from an RV and Marine anti-freeze which contained propylene glycol, the label was provided only as an example of the type of antifreeze which would be covered by the patent. (PTO History at Ex. 21). This conclusion is supported by the fact that although the claim subsequently was amended both by Gentile and then by the examiner, there were no limitations made to the "non-toxic liquid antifreeze" description contained in the claim. In addition, there is no precise chemical composition of the antifreeze provided either in the label or in the viscosity comparison made by Gentile.[8] It makes no sense to limit the definition of "antifreeze" to an undefined product. "Given the examiner's obligation to confer the broadest reasonable interpretation on [a claim term], if the examiner wanted to hinge patentability upon [a par-

---

8. Not only are the ingredients of the product not defined in the label with any specificity, but the label provided is for a different product than the one Gentile used to compare viscosity. (*Compare* PTO History Exs. 4 and 21). Presumably the composition of the products differ to some extent.

ticular interpretation of the term], he would have said so, and required a specific amendment to reflect [that interpretation.]" *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1347 (Fed.Cir.2001) (reversing district court's claim construction as unnecessarily limiting the meaning of the disputed term). Since the examiner did not limit the claim to propylene glycol or to an antifreeze used in RVs, the court should not do so either.

■ I do find, however, that Gentile did limit his definition of anti-freeze to the Random House Dictionary definition of "a liquid used in a radiator of an internal combustion engine to lower the freezing point of the cooling medium." During the interview with the examiner, and in the subsequently filed summary and remarks, Gentile and his attorney stressed that this was the definition Gentile intended. (*See* PTO History at Ex. 21, pp. 2, 4). A standard dictionary definition can be used to define the ordinary meaning for the purpose of claim construction. *See MSM Invs. Co., LLC v. Carolwood Corp.,* 259 F.3d 1335, 1339 (Fed.Cir.2001) (citing Webster's Dictionary to define term "feeding"); *see also Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1584 n. 6 (Fed. Cir.1996) (judges are "free to consult" dictionaries "at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents"). Thus, one reading the patent history could assume that this definition applied, even though the examiner declined to amend the claim to expressly limit the type of antifreeze involved. Such an interpreta-

tion, limiting the claim to the dictionary definition given by the inventor, properly balances the well established principles of claim construction—namely, that "while terms used in a patent generally should be construed to have the ordinary meaning they had at the time of the patent application, a patentee is still entitled to 'choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history.' ... In those circumstances where the patentee's meaning is clear, the court must adopt the special definition of the term." *Bailey v. Dart Container Corp.,* 157 F.Supp.2d 110, 114 (D.Mass.2001) (quoting *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d at 1578). Here, the inventor selected the "ordinary meaning" to be given to the term "antifreeze" and his choice should be honored.

Admittedly, there are other dictionary definitions which are broader, and which the plaintiff now urges. For example, Merriam–Webster's Collegiate Dictionary has defined antifreeze since 1924 as "a substance added to a liquid (as the water in an automobile engine) to lower its freezing point." Other definitions are more specific. For example, "Dictionary.com" defines antifreeze as a "substance, often a liquid such as ethylene glycol or alcohol, mixed with another liquid to lower its freezing point," with the source of the definition being The American Heritage Dictionary of the English Language (Fourth Ed.2000). There are a myriad of dictionary definitions which can be used to define "antifreeze." The inventor chose The Random House Dictionary definition to define his claim.[9]

9. Although the precise edition of the dictionary used by the plaintiff has not been cited, the court found this definition in The Random House Dictionary of the English Language (Second Edition) at p. 91 (1987).

■ Gentile argues that the references to the definition of antifreeze were intended only to distinguish plain water as being an antifreeze. (*See* Pl.'s Mem at 11). As an initial matter, it does not appear that the repeated statements as to what the inventor meant by "antifreeze" were intended to be so limited in purpose. More importantly, "whether the limiting assertions made were necessary for allowance of the claims is not dispositive as to whether a patentee has disclaimed a certain subject matter .... Rather, what is determinative is whether the patentee has defined a claim term as excluding a broader interpretation with reasonable clarity and deliberateness." *KX Indus., L.P. v. Pur Water Purification Corp.*, 18 Fed.Appx. at 876, 2001 U.S.App. LEXIS 18155, at *11 (internal citations omitted).

Gentile further argues that he should not be bound by his attorney's summary of the meeting with the examiner, relying on *Intervet Am., Inc. v. Kee–Vet Labs., Inc.*, 887 F.2d 1050 (Fed.Cir.1989). In that case, an attorney, in the "Remarks" section of an amendment, "made the unqualified and now admittedly untrue statement that 'the claims are restricted to a single vaccination scheme.'" *Id.* at 1054. The court concluded that the examiner had not relied on the statement and that the language of the claim, as opposed to the erroneous remark of the attorney in the course of prosecution of the application would control. *Id.* However, the present case differs significantly from *Intervet*. There is no conspicuous error, and no one reading the history would have any "reason to believe that a mistake was made or that the inventor meant anything other than what he said." *See Hockerson–Halberstadt, Inc. v. Am. Sporting Goods Corp.*, 222 F.3d at 957. Here, Gentile "clearly 'intended his statements to be relied on' by the patent examiner, and 'the courts and the public may rely on them as

well.'" *Les Traitments Des Eaux Poseidon, Inc. v. KWI, Inc.*, 135 F.Supp.2d 126, 137 (D.Mass.2001) (quoting *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303 (Fed.Cir.1997)).

**C. *Summary of Claim Construction***

Based on the foregoing, I construe the phrase "non-toxic liquid antifreeze" in the '906 Patent as not excluding non-toxic salt solutions and as limiting the "antifreeze" to "a liquid used in the radiator of an internal combustion engine to lower the freezing point of the cooling medium."

**D. *Infringement***

■ After determining the scope of a claim, the court compares the claim to the accused device "to determine, as a matter of fact, whether all of the claim limitations are present, either literally or by a substantial equivalent, in the accused device." *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d at 988. In the present case, Gentile argues that there is literal infringement of his patent, although he argues as a backup that the doctrine of equivalents mandates a finding of infringement. As a general statement, under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21, 117 S.Ct. 1040, 1045, 137 L.Ed.2d 146 (1997). In the present case, since this court recommends a finding of literal infringement, the doctrine of equivalents will not be reached. However, this court does note that the Franklin ball being sold today, as provided to the court during argument, advertises itself as being "designed for use in cold weather," as containing a "dampen-

ing liquid" in a location and amount which appears to be the same as Gentile's Patent, and which asserts that the "dampening system is designed to sustain a lower center of gravity" which keeps the ball "from bouncing for sharper passing, shooting and better control," all qualifications identified in the Gentile Patent. Thus, if there is no literal infringement, this court recommends that the issue of equivalents be explored.

▆▆▆ Franklin admits that absent any limitations in the patent, its ball contains a "non-toxic liquid antifreeze." As detailed above, this court has rejected the claimed exclusion of salt solutions on which Franklin principally relies. Therefore, it appears that Franklin's ball literally infringes on the '906 Patent.

The issue whether the Franklin ball contains "antifreeze" as defined above requires more analysis. Gentile asserted as an undisputed fact that "liquid calcium chloride is used commercially as an antifreeze in a variety of products including motor vehicles as well as a non-toxic therapeutic agent." (Pl.'s Opp. at 2, ¶ 5). Gentile also submitted excerpts from various publications relating to the properties and uses of calcium chlorides.[10] These include an excerpt from the Merck Index (copyright 1952) that calcium chloride-dihydrate can be used in "automobile antifreeze mixtures." (Pl.'s Opp. at Ex. E). He also encloses an excerpt from a book of "Henley's Formulas." This publication, in one form or another, appears to have been copyrighted in 1907 with copyrights renewed through at least 1981 according to the volume located by the court at Northeastern University's library.[11] The book of "home remedies" provides that to make an antifreeze for a car, "mix and filter 4½ pounds pure calcium chloride and a gallon of warm water and put the solution in the radiator or tank." (Pl.'s Opp. at Ex. E).

Franklin did not respond to the substance of Gentile's factual assertion. Rather, it objected on the grounds that the "sentence is not supported by an affidavit on personal knowledge, or by an expert's affidavit" and that the excerpts provided by the plaintiff were not "authenticated." (Def.'s Reply Mem. at 3, ¶ 5). *See* note 10, *supra.* These objections are without merit. Gentile was free to submit common treatises relating to the properties of Franklin's claimed "salt calcium chloride." The level of information needed to address this factual assertion did not rise to the level of needing expert testimony. Franklin has not raised a specific objection to a factual assertion. Therefore, the court can properly conclude that the relevant facts are undisputed. *See Pegasus Mgmt. Co., Inc. v. Lyssa, Inc.,* 995 F.Supp. 29, 31 (D.Mass.1998) (in summary judgment analysis, court relied on statement of undisputed facts "to the extent that no objection has been interposed or that the particular objection is determined to be without merit"). *See also Carreiro v. Rhodes Gill & Co., Ltd.,* 68 F.3d 1443, 1446 n. 3 (1st Cir.1995) (citing Local Rule 56.1, court

---

10. Franklin contends that these excerpts are not authenticated. (*See* Reply Mem. at 3, ¶ 5). While a better practice would have been to submit these documents attached to an affidavit, the court has satisfied itself that the copies are true and accurate copies of the documents they purport to be.

11. The plaintiff's excerpt is from a book entitled "Henley's Formulas for Home and Workshop" edited by Gardner D. Hiscox, M.E. The court located a volume entitled "Henley's Twentieth Century Book of Formulas, Processes and Trade Secrets" edited by Gardner D. Hiscox, M.E., Revised 1956 by Harry E. Eisenson, B.S., M.S.E., New Revised and Enlarged Edition by Prof. T. O'Conor Sloane, A.B., A.M., E.M., Ph.D. The references in both volumes for "Antifreeze Solution for Automobilists" are identical.

states that party opposing summary judgment must provide a concise statement of material disputed facts with citations to appropriate authorities; "properly supported facts set forth by the moving party are deemed admitted unless controverted by the factual statement of the opposing party").

However, the court does not have to rely on Franklin's lack of objection. A "court may receive extrinsic evidence to educate itself about the invention and the relevant technology, but the court may not use extrinsic evidence to arrive at a claim construction that is clearly at odds with the construction mandated by the intrinsic evidence." *Karlin Tech., Inc. v. Surgical Dynamics, Inc.,* 177 F.3d at 971. I have already construed the claim so that there are no limitations on the composition of the antifreeze other than it must be "nontoxic" (which is undisputed) "liquid" (which is undisputed) and able to be used "in a radiator of an internal combustion engine to lower the freezing point of the cooling medium." The court's own research establishes that calcium chloride may be used for that purpose. The objections raised by Franklin elevate form over substance and do not address the straightforward factual claim made.

For all these reasons, the court recommends that summary judgment be entered in favor of Gentile on his claim of patent infringement, and that summary judgment be denied on Franklin's claim of non-infringement.

## V. THE FALSE MARKING CLAIM

■ In order to prove false patent marking under 35 U.S.C. § 292(a),[12] the plaintiff "must establish '(1) a marking importing that an object is patented (2) falsely affixed to (3) an unpatented article (4) with intent to deceive the public.'" *Cal. Med. Prods., Inc. v. Tecnol Med. Prods., Inc.,* 921 F.Supp. 1219, 1261 (D.Del.1995) (quoting *Mayview Corp. v. Rodstein,* 620 F.2d 1347, 1359 (9th Cir.1980)). The false marking statute is "penal in nature and must be strictly construed ...." *Proportion–Air, Inc. v. Buzmatics, Inc.,* 57 F.3d 1085, 1995 WL 360549, at *3 (Fed.Cir. 1995). Gentile claims that Franklin has marked its product "patent pending" or "patented" without proper license or permission in violation of 35 U.S.C. § 292(a), and moves for summary judgment on the false marking claim for, at a minimum, the time period between August 1997 and March 1998. Franklin disputes Gentile's argument and itself moves for summary judgment, stating that the Franklin product was licensed under either the Gentile or the Aiello patent at all pertinent times.

---

**12.** The governing statute, 35 U.S.C. § 292(a), reads:

Whoever, without the consent of the patentee, marks upon, or affixes to, or uses in advertising in connection with anything made, used, offered for sale, or sold by such person within the United States, the name or any imitation of the name of the patentee, the patent number, or the words "patent," "patentee," or the like, with the intent of counterfeiting or imitating the mark of the patentee, or of deceiving the public and inducing them to believe that the thing was made, offered for sale, sold, or imported into the United States by or with the consent of the patentee; or

Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented, for the purpose of deceiving the public; or

Whoever marks upon, or affixes to, or uses in advertising in connection with any article, the words "patent applied for," "patent pending," or any word importing that an application for patent has been made, when no application for patent has been made, or if made, is not pending, for the purpose of deceiving the public—

Shall be fined not more than $500 for every such offense.

## A. Statement of Facts Contract Between Franklin and Sea–Mor

In or about 1994, Franklin began manufacturing its product pursuant to a contract with Sea–Mor, Gentile's then employer, that purportedly licensed the product under the Gentile patent while the patent was pending. (*See* Compl. ¶ 6). The effective dates of this agreement are in dispute. Franklin claims that the agreement was effective from December 15, 1994 through December 31, 1997. (*See* Supp. Decl. of Charles Quinn at ¶ 3 (Docket # 37)). Gentile claims that Sea–Mor never had authority to license the patent (*see* Compl. ¶ 6), but concedes that Franklin could have relied on Sea–Mor's apparent authority to make such an agreement. Gentile considers this apparent authority definitively revoked and the contract terminated as of August 1997 pursuant to a Mutual Reciprocal Release between Franklin and Gentile. (*See* Pl.'s Mem. at 3, ¶ 2 and Ex. F). Franklin denies that the release revoked this authority. (*See* Def.'s Reply Mem at p. 3, ¶ 2).

Around the time of the Release, Gentile and Franklin also entered into a Memorandum of Understanding pursuant to which they agreed "to enter into negotiation of a License Agreement between them for license by Franklin Sports of the Gentile Anti–Gravity Ball patent under essentially the same monetary terms as the existing Agreement between Franklin Sports and Sea–Mor, subject to determination by [Franklin's counsel] that the Gentile patent claims which have been allowed by the Patent Office are sufficiently broad to cover the Sun Hockey Ball." (Pl.'s Mem. at

Ex. F). No such license was ever negotiated. (*See* Compl. at ¶ 13). It is agreed that, beginning on December 15, 1994 (or whenever production of its ball began), Franklin's reference on its product to "patent pending" related to the Gentile patent. It is disputed whether Franklin continued to be authorized to refer to the Gentile patent pending after August 1997.

## Contract Between Franklin and Sun Hockey

In March 1998, Franklin executed a License, Royalty and Settlement Agreement with Sun Hockey. (Supp. Quinn Decl. at ¶ 3(b)). According to Franklin, this agreement authorized it to manufacture its ball as "patent pending"—meaning the Aiello patent. (*See id.*, and Quinn Decl. at ¶ 3).[13] Moreover, Franklin contends that although the agreement was signed in March of 1998, it "was effective from September 1, 1997, and continues to be in effect to this date." (Supp. Quinn Decl. at ¶ 3(b)). No further information is given as to how or why the license went into effect prior to its execution.

Franklin has not put into evidence any copy of the Sun Hockey Agreement. Gentile has submitted a document entitled License, Royalty and Settlement Agreement Sun Hockey, Inc. and Franklin Sports, Inc. (Pl.'s Mem. at Ex. G). However, Franklin has refused to authenticate the document and the copy is unsigned. (*See* Def.'s Reply Mem. at 4, ¶ 3). Thus, the scope and term of the licensing agreement between Sun and Franklin have not been proven and are in dispute. This is critical since this is the alleged agreement which covers the period after the Sea–Mor license expired.

---

**13.** In response to the court's inquiry as to how the same ball could be manufactured under two different patents, Franklin stated that it did not know the scope of Gentile's pending patent application. Gentile argues that when Franklin made its agreement with

Sun Hockey, Franklin knew that its ball did not conform with the Aiello patent under which it was then licensed. (*See* Pl.'s Mem. at 18–19). This argument raises disputed facts which further support the denial of the motions for summary judgment.

### B. *Analysis*

■ Gentile argues that the documents produced at summary judgment show that Franklin manufactured its product without permission from any patent-holder from August 1997 to March 1998. Franklin contends that its agreement with Sun retroactively confers Sun's permission from September 1, 1997, and thus it had overlapping permissions from Sea–Mor and from Sun. Summary judgment may not be entered if the record presents any genuine issues of material fact such that a reasonable jury could return a verdict for either party. *See Thomas v. Metro. Life Ins. Co.,* 40 F.3d 505, 508 (1st Cir.1994). Here, there are material facts in dispute relating to the scope and term of both of the key contracts. In addition, the circumstances, not addressed by affidavit in this motion, regarding any early termination of the Sea–Mor contract, also speak to the "intent to deceive" necessary to support a false marking claim. Because material issues remain preventing the disposition of the false marking claim, this court recommends that both plaintiff's and defendant's motions summary judgment on this count be denied.

### VI. *CONCLUSION*

For the reasons detailed herein, this court recommends to the district judge to

14. The parties are hereby advised that under the provisions of Rule 72, Fed.R.Civ.P., any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.

whom this case is assigned that Plaintiff's Motion for Summary Judgment on Count I, patent infringement, be ALLOWED, and that Defendant's Motion for Summary Judgment regarding Count I be DENIED. This court further recommends that both Motions for Summary Judgment as to Count V, false marking, be DENIED.[14]

February 15, 2002.

*See Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–151 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4–5 (1st Cir.1998).